UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FEDERAL-MOGUL WORLD WIDE, INC., a
Michigan corporation, and FEDERAL-MOGUL
CORPORATION, a Michigan corporation,

                    Plaintiffs,                         Case No. 11-10675
                                                      Honorable Julian Abele Cook, Jr.

v.

MAHLE GMBH, a German corporation, and MAHLE
ENGINE COMPONENTS USA, INC., a Delaware
corporation,
                    Defendants.

ORDER

      This case pertains to claims by the Plaintiffs, Federal-Mogul World Wide, Inc., and Federal-Mogul Corporation (collectively identified as "Federal-Mogul"), that the Defendants, Mahle GmbH and Mahle Engine Components USA, Inc.( collectively identified as "Mahle"), infringed upon their rights under U.S. Patent No. 6,260,472 ("the '472 Patent"), which precludes all other persons and entities from making, using, selling, and offering to utilize their patented inventions without authority.  They have also accused these two Defendants of a variety of other actionable violations (i.e., breach of contract, misappropriation of trade secrets, unfair competition, as well as an infringement of another patent, namely U.S. Patent No. 6,557,457 ("the '457 Patent").

      There are three motions currently pending before the Court for resolution.  The first is a request by Federal-Mogul for the Court to issue a preliminary injunction which, if granted, would prevent an infringement of the '472 and '457 Patent.  The other two motions reflect separate – but nearly identical – efforts by the Defendants to obtain a dismissal of the claims by Federal-Mogul

1

or, alternatively, to obtain the entry of a summary judgment on the amended complaint.

I.

The parties to this litigation are competitors in the automotive supply industry. Federal-Mogul manufactures and sells a variety of parts and components for vehicle engines which include friction-welded steel pistons.[1] One of the two Defendants, Mahle GmbH, is a German corporation in the business of manufacturing components and systems for combustion engines, including the manufacture and sale of, *inter alia,* pistons for use by diesel engine manufacturers. The other Defendant, Mahle Engine Components USA, Inc., is a Tennessee based corporation that manufactures and sells pistons throughout the United States. A third entity, and a non-party to this litigation, is Manufacturing Technology, Inc. ("M Tech") which manufactures many of Federal-Mogul's steel friction-welded pistons.

A brief inquiry into the history of each company is necessary in order for the Court to resolve the pending motions.

Purchase and Sale of Metal Leve

Mahle acquired more than fifty percent of the voting shares of a Brazilian-based corporation, Metal Leve, S.A. ("Metal Leve Brazil") and Metal Leve, Inc. ("Metal Leve America") in June of 1996. Both of these companies (collectively identified as "Metal Leve") were in the business of manufacturing and selling pistons and other engine parts during all of the times that are relevant to this litigation. Metal Leve Brazil conducted its operations in the United States through

---

[1]The parties are in agreement that Federal-Mogul holds a forty five percentage share of the steel pistons market in the United States. By virtue of a license from Federal-Mogul World Wide, Federal-Mogul has become the owner of the '472 and '457 Patents.

2

Metal Leve America.

Approximately one year after the acquisition of Metal Leve by Mahle, the Federal Trade Commission ("FTC") expressed its concerns that this transaction would unfairly lessen competition in the United States market for "articulated pistons."[2]  It was the FTC's view that (1) Mahle held more than a fifty percentage share of the market, and (2) Metal Leve had a forty-five percentage share of sales for articulated pistons, which produced a combined market share of more than ninety five percent.  An investigation by the FTC ensued.

During the pendency of this federal agency's review, it entered into an "Agreement to Hold Separate" ("Separation Agreement") with Mahle and Metal Leve for the purpose of "preserving [these entities'] piston businesses and other businesses as viable independent businesses pending the [FTC's] investigation," and to "prevent any anticompetitive effects resulting from the Acquisition. . . ."  (Mahle Mot Dismiss, Exh. 12 at 2).  As a part of the Separation Agreement, Mahle and Metal Leve agreed to hold their businesses separate and apart, and to run them independently of each other. Metal Leve Brazil also agreed to provide the employees of Metal Leve America with needed technical knowledge for at least two years after the divestiture in an effort to ensure that their business in the United States would become fully competitive in the American market.  Finally, Mahle agreed, *inter alia,* that it would not (1) exercise supervision or control over Metal Leve or any of its business operations, directly or indirectly, and (2) receive, have access to, or use any of Metal Leve's confidential information, except for that information which would have been otherwise available in the normal course of business if the acquisition had not taken place.

---

[2]According to the FTC, "articulated pistons" are two-piece pistons with a crown made of steel and a skirt made of aluminum, in which these two parts are able to move independently of each other.

3

(*Id*. at 4).  The Separation Agreement defined the phrase, "confidential information" as being "competitively sensitive or proprietary information [which included] financial information, customer lists, price lists, prices, engineering, manufacturing, and marketing methods, patents, technologies, processes, research and development or other trade secrets."  (*Id*).Ultimately, Mahle entered into a consent order with the FTC on June 4, 1997 which required it to divest its interests in Metal Leve America and Metal Leve Brazil pertaining to the piston market in the United States. In its order, the FTC made reference to the Separation Agreement, which contained the following language:

> F.     Respondents shall comply with all terms of the Agreement to Hold Separate signed by the Respondents and accepted by the Commission on August 30, 1996, which is attached to this Order and made a part hereof, and which shall continue in effect until such time as Respondents have accomplished the divestiture required by this Order.

(Mahle Mot. Dismiss,. Exh. 8 at 7).  Mahle chose to accomplish the divestiture by requiring Metal Leve Brazil to sell its interests in Metal Leve America to T&N Industries ("T&N") on March 19, 1997 through a Stock Purchase Agreement.

Mahle claims that, acting upon the terms of this "Stock Purchase Agreement" and related documents, Metal Leve Brazil continued to supply Metal Leve America with Brazilian-made pistons for an ultimate sale to customers in the United States for at least three years until 2000.  It also notes that notwithstanding the sale of Metal Leve America to T&N, (1) Mahle continued to operate Metal Leve Brazil as its owner, and (2) some of the engineers, who remained with Metal leve Brazil, had worked on the development of piston technology in cooperation with Metal Leve America.

The parties have identified certain terms within the "Stock Purchase Agreement" which, in

4

their opinions, were thought to be important.  For its part, Federal-Mogul argues that certain aspects of the "Stock Purchase Agreement" required Mahle to (1) divest of all of its shares in Metal Leve America, (2) force Metal Leve Brazil to transfer to T&N all right title, and interest of whatever nature in assets related to certain pistons involved with Metal Leve America's friction-welded steel piston business and (3) "use its commercially reasonable efforts to keep confidential and to cause its employees to keep confidential" all proprietary information related to Metal Leve America's articulated piston technology confidential and, specifically, not to share it with Mahle or any of its subsidiaries.  By contrast, Mahle submits that the "Stock Purchase Agreement" was of limited time (three years from the closing date) and scope, and made with a recognition that T&N was acquiring assets from a company that would continue as a competitor.  Moreover, Mahle emphasizes that the parties to the "Stock Purchase Agreement" were mostly concerned with restricting Metal Leve Brazil from developing and manufacturing articulated pistons, directly or through the hiring of its technical employees who worked on those products.

### Purchase of T&N by Federal-Mogul

In 1998, Federal-Mogul acquired the assets of T&N, along with the existing piston business of Metal Leve.  The result was Federal-Mogul's acquisition of the same business that Mahle had been required to sell to T&N.  According to Mahle, the FTC soon thereafter complained of antitrust violations that had been created by the transaction, allegedly based on Federal-Mogul's eighty percentage  share of the worldwide market for "thinwall bearings" used in car, truck, and heavy equipment engines.  Federal-Mogul was allegedly required to divest substantial assets from this portion of its business, including by requiring certain engineers to leave its employment rolls, and forcing it to provide incentives to those engineers who stayed with the eventual acquiring entity.

5

<u>The Patents at Issue in this Lawsuit</u>

A.      <u>The '472 Patent</u>

Federal-Mogul contends that it was awarded the'472 Patent ("One-Piece Integral Skirt Piston and Method of Making the Same") for its development of an innovative one-piece piston that is made completely of steel and formed by a friction-welding process.  According to Federal-Mogul, this product is made from two steel halves that are friction-welded together to form one piece.         "Friction-welding" is a process whereby one of the two parts that are to be secured together is rotated at a very high speed and then mated together with the other part under a very high force.  After the singular piece piston is formed, the "flashings" (i.e. the protrusions of excess material at the welding joint) caused by the friction-welding process can be removed during finishing.  As Mahle points out, when it was originally issued in July of 2001, the '472 patent featured only a single claim which involved a method for making a certain kind of piston, and included a friction-welding step.  Nevertheless, the United States Patent and Trademark Office ("USPTO") granted a request by Mahle and another competitor to reexamine the '472 patent. Mahle asserts that, on the basis of its reexamination inquiry, the USPTO rejected the single claim of the '472 Patent on at least four separate occasions, opining that the invention was obvious in light of a combination of prior art within earlier-issued patents.[3]  This ultimately led to the cancellation of the single claim of the '472 Patent in its original form.  According to Mahle, the amendments to the '472 Patent that were ultimately upheld by the Board of Patent Appeals were combined with the '472 Patent's original claim 1, and that combination is what now appears in the

_____

[3]According to Mahle, the earlier references were to "Berchem (U.S. Patent 4,532,686), German (DE Patent 3,302,671) issued to Dursch, and FWM."  (Mahle Opp. to Prelim. Inj. at 7).

6

'472 Patent as claim 5.  In its entirety, claim 5 of the '472 Patent in its current form describes:

> A method of making a piston having a crown and a skirt formed as one piece with the crown, said method comprising: forming a single piece upper crown member of steel having a central body portion, an outer annular sidewall depending from said body portion for receiving at least one ring groove, and an annular connecting collar depending from said body portion in radially inwardly spaced relation to said sidewall and presenting a joining face at a lower free end thereof; forming a single piece lower crown member of steel as a discrete component separate from said upper crown member and including, as part of the one piece lower crown member structure, a pair of pin boss portions, a pair of oppositely disposed skirt portions formed as one piece with and bridging said pin boss portions, and an annular connecting collar extending upwardly from the pin boss portions and presenting a joining face at a free end thereof; bringing the aligned joining face of the upper crown member into engagement with the joining face of the lower crown member; and friction-welding the connecting collars together to produce a permanent friction-weld joint across the joining faces in such manner as to secure the upper crown member intimately to the lower crown member to provide a resultant unified one-piece construction of the joined crown members, and wherein during the step of friction welding, forming a resultant flashing of material at the joining faces extending circumferentially about the connecting collars and projecting radially outwardly of the connecting collars toward said skirt portions, wherein the flashing of material also extends radially inwardly of the connecting collars following welding, and wherein the lower crown member is constructed such that the flashing of material that extends radially inwardly of the connecting collars is formed to be open to a space defined between radially inner-most margins of the pin bosses.

(Amended Compl. Exh. C, col. 2, lines 27-60).  It is Mahle's alleged violation of claim 5 that forms the basis of Federal-Mogul's request for the Court to issue a preliminary injunction.

In their pleadings in opposition to the request for injunctive relief, the Defendants collectively assert that the '472 Patent is invalid because of two pieces of prior art.  According to them, the first prior art was contained in Metal Leve's friction-welded steel pistons that had been made for an entity called Cummins between 1995 and 1998.  They collectively accuse Federal-Mogul of withholding this prior art from the USPTO, even though it purportedly contained the same feature that Federal-Mogul sought to patent through claim 5.  These Defendants also note that Federal-Mogul acquired the unit within the Metal Leve corporate structure that created the

7

Cummins' piston.  Additionally, Mahle accuses Federal-Mogul of committing a purposeful omission by failing to disclose the existence of another patent; namely, the "Japan '157 Reference."[4]  In Mahle's opinion, the "Japan '157 Reference" contains features that invalidate claim 5 of the '472 Patent because it constituted  prior art.  They also accuse Federal-Mogul of misconduct by failing to cite this prior art to the USPTO in its prosecution of the '472 Patent, especially since it was apparently willing to do so in its prosecution of another piston patent, No. 7,870,669 ("the '669 Patent"), which was being litigated at the same time by the same patent attorney.

B.      The '457 Patent

        The '457 Patent ("Bushingless Piston and Connecting Rod Assembly and Method of Manufacture") appears to comprise 23 claims.  According to Federal-Mogul, it is a method patent, and relates to a piston assembly which utilizes a coating of a special material (i.e., manganese phosphate) on various components, in place of conventional bushings.  (Amended Compl. Exh. B). Comparatively speaking, the parties devote significantly less time discussing the '457 Patent, its novelty, or its prosecution history.  Mahle believes that any legal claims that are based on the '457 Patent lack merit because the amended complaint does not identify a single infringing product.

Alleged Acts of Infringement

A.      Infringement of the '472 Patent

        Recently, Federal-Mogul and Mahle have been competing for an opportunity to supply steel pistons to the General Motors Corporation ("GM") for use in its new Duramax diesel engine.

---

[4]In their responsive pleadings, Mahle refers to it in its complete form as the JP 60-166157 reference.

8

Although Federal-Mogul acknowledges that GM is not slated to launch its new engine until the 2015 model year (according to Mahle, this date  has now been delayed until 2017), it maintains that this auto manufacturer and its suppliers are currently making plans relating to the development of this diesel engine which, in its judgment, makes time to be of the essence.

Based upon its belief that Mahle has been soliciting GM's business with a friction-welded steel piston which infringes upon its '472 Patent, Federal-Mogul initiated this lawsuit. As noted, it also filed a petition for a preliminary injunction, in which it accuses Mahle of infringing the '472 patent by producing a piston under the name of MonoWeld® which it believes encompasses each element in claim 5 of the '472 Patent.[5]  To support this argument, Federal-Mogul points to a declaration that had been prepared by one of its employees, Keri Westbrooke, who works as the Director of Engineering and Technology and came to the Company in 1998 as a former employee of Metal Leve America during the acquisition of T&N by Federal-Mogul.  As part of his declaration, Westbrook prepared a claim chart which (1) contains a picture of the MonoWeld® piston as it allegedly appears in Mahle GmbH's German-language literature, and (2) labels, with the letters A-F, each aspect of the MonoWeld® piston that he believes infringes the five elements which comprise claim 5 of the '472 Patent. (Fed. Mogul's. Mot. Prelim. Inj., Exh. C at Attachment 1).  Preliminary discovery has revealed additional evidence which Federal-Mogul believes supports its claim, including (1) a nomination contract from GM to Mahle indicating that the program was awarded to Mahle in Morristown, Tennessee; (2) two separate emails from an employee of Mahle on February 21, 2011 which indicate that (a) "DMAX has nominated MAHLE Morristown to

_____

[5]The Court notes that Federal-Mogul did not include the '457 Patent in its request for injunctive relief against Mahle.

9

supply a top-welded steel piston for the MY2015 DMAX 6.6L V8 diesel engine!" and (b) "[s]ince MAHLE Morristown will be a new supplier for DMAX [the GM Representative] send to me [sic] the forms to be completed so that she can set-up the contract." (Pl's. Reply to Pr. Inj. Motion Ex. 3); and (3) design options presented to GM by Mahle including a friction-welded steel piston design. Additionally, discovery which was conducted as late as July 15, 2011 and submitted to the Court on July 21, 2011 - just four days before a hearing on the currently pending motion, reveals what Federal-Mogul believes is extensive documentation in the form of purchase orders and drawings addressed from Mahle GmbH and Mahle Engine to M Tech requesting what appears to be steel friction-welded pistons for 10 different diesel engines for 5 different companies.

In its responsive pleadings, Mahle does not appear to contest the accuracy of Federal-Mogul's depiction of the MonoWeld® piston or Westbrook's claim chart. Rather, Mahle emphasizes that (1) the illustration of the MonoWeld® piston was taken from its German product literature, (2) the depicted piston design will be made only in a manufacturing plaint in Rottweil, Germany, and will be sold only to Volvo in Europe, (3) the piston in the picture is not yet being sold in Europe, and (4) the piston design in the Westbrook claim chart is not made or sold anywhere in the United States. Moreover, while Mahle acknowledges having obtained a commitment from GM to use its pistons for the 2015 Duramax engine program, it argues that the pistons are not substantially similar to the European MonoWeld® design as depicted in Westbrook's claim chart.

In addition to the allegations which surround the GM business, Federal-Mogul claims that Mahle is providing piston samples to Caterpillar, Inc. in the United States which also infringe its '472 Patent. According to Federal-Mogul, Caterpillar is a patent sophisticated company, and one of its managers approached Westbrook with a request for Federal-Mogul to grant it a license under

the '472 Patent.  Westbrook asserts that he was told that Mahle is supplying steel friction-welded pistons to Caterpillar for use in its C145 engine.  Westbrook, presumably relying upon that conversation, opined that Caterpillar sought to obtain a license which would insure that Mahle could continue to supply steel friction-welded pistons to them in the production of the C145. Ultimately, the request for a license was denied.  Federal-Mogul also points to purchase orders, drawings, and invoices from Mahle to M Tech, obtained through expedited discovery, which purport to show requests for M Tech to friction-weld a steel piston for Caterpillar's C145 engine program, which is conducted in the United States.  In Federal-Mogul's opinion, the drawings illustrate Mahle's infringement through the presence of characteristic flashing, as described above. Moreover, Federal-Mogul points to documents on Mahle's letterhead which appear to forecast a meeting at the "MAHLE Tech Center, Detroit to kick off the Caterpillar C145 MonoWeld piston program." (Fed Mogul's Reply to Prelim. Inj., Ex. 7).

Mahle disputes this evidence sharply, citing the deposition testimony of Michael Wilder that (1) the Caterpillar C145 engine program was cancelled based on a complete redesign of the engine, and (2) even if it had not been cancelled, it is impossible for the design of the GM DMAX piston to infringe the '472 Patent design.

B.    Infringement of the '457 Patent

Federal-Mogul has proffered that which it claims to be a "Statement of Work" (although it is technically labeled a "Statement of Requirements") prepared by GM in connection with the 2015 program.  Federal-Mogul avers that, according to the "Statement of Work," GM requires its vendor to produce a steel piston assembly that is coated entirely with manganese phosphate, and contains a steel piston body, along with a steel connecting rod, and a steel wrist pin.

11

Federal-Mogul suggests that most, if not all, of these requirements incorporate the elements of claim 1 of the '457 patent, which contain the following description:

> 1.      A piston assembly for an internal combustion engine comprising:
>     a       piston body formed with a cross bore having a steel running surface;
>     a       steel connecting rod having a cross bore with a steel running surface aligned with said cross bore of said piston body;
>     a       steel wrist pin disposed in said aligned bores and coupling said piston body and said connecting rod, said wrist pin having a steel running surface; and
>     a       coating of manganese phosphate applied to at least one of said steel running surfaces of said wrist pin, said connecting rod and said piston body.

(Amend. Comp. Exh. B, col. 3 lines 54-67).[6]  Federal-Mogul thus opines that, in light of the requirements of GM's "Statement of Work" for the 2015 diesel engine program, the admission by Mahle that it has offered to sell steel pistons for the 2015 program is conclusive proof that it has infringed the '457 Patent.

Finally, Federal-Mogul asserts that a further review of a document from Mahle offering to sell GM steel friction-welded pistons reveals the inclusion of a device which would infringe the '457 Patent.  This apparently includes the Duramax contract, in which Mahle has allegedly agreed to coat all of its infringing steel friction-welded pistons with manganese phosphate.

### The Disputed Role of M Tech

According to Federal-Mogul, (1) M Tech supplies it with friction-welding services on an ongoing basis, and (2) its engineering professionals have heard comments from unidentified workers

---

[6]In an apparent acknowledgment that claim 1 of the '457 Patent does not require a manganese phosphate coating of the entire piston assembly, Federal - Mogul notes that "[l]ogically, if the entire piston assembly is required to be coated with manganese phosphate, the claim limitation requiring that any one of the running surfaces of the wrist pin, connecting rod, or piston body be coated is met."  ((Fed Mogul's. Opp. to Mot. Dismiss at 8).

at the M Tech site who have commented that M Tech was also making steel friction-welded pistons for Mahle which are replicas of Federal-Mogul pistons.  Federal-Mogul also claims that (1)  during a February 2011 conference call with an M Tech engineer, two of its engineers (Norbert G. Schneider and Carmo Ribeiro) heard comments that led them to believe that their Company is making steel friction-welded pistons of possibly poorer quality for Mahle GmbH and/or Mahle, Inc., and (2) Schneider's review of the M Tech log books in February of 2011 revealed that, in his judgment, M Tech had also performed friction-welding piston projects for Mahle.

Furthermore, Federal-Mogul proffers purchase orders, invoices, drawings, and the deposition remarks of an M Tech witness (Dietmar Spindler) who opined that M Tech (1) played no role in forming, designing, or supplying the piston components, and (2) received the parts to be welded from Mahle, welded the parts, and shipped them back.   (Fed. Mogul's Opp. to Mot. Dismiss, Exh 1).

## II.

Turning first to the motions by Mahle to dismiss and/or enter a summary judgment as to all aspects of Federal-Mogul's amended complaint, the Court will resolve these requests simultaneously because these Defendants have raised similar arguments to support their respective positions in this controversy.

Fed R. Civ. P. 8(a)(2) requires a plaintiff's complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief [in order to] give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47  (1957) and Fed. R. Civ. P. 8(a)(2)). While this pleading standard does not mandate "detailed" factual allegations, it does require

more than the bare assertion of legal conclusions. *See Twombly*, 550 U.S. at 555. Therefore, the complaint must offer more than "an unadorned, the defendant-unlawfully-harmed me accusation." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Otherwise, it is subject to dismissal under Rule 12(b)(6).

Here, the Defendants have moved, in part, to dismiss Federal-Mogul's complaint under Fed. R. Civ. P. 12(b)(6).   Generally, when considering such a dispositive motion, a court must construe the complaint in a light that is most favorable to the plaintiffs, accept their factual allegations as being  true, and draw all reasonable factual inferences in the plaintiffs' favor. *Tipton v. Corr. Med. Services, Inc.*, No. 08-421, 2009 WL 2135226 (W.D. Mich. July 15, 2009).  However, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Claims are capable of surviving a Rule 12(b)(6) motion only if the "[f]actual allegations [are] enough to raise a right to relief above the speculative level . . . on the assumption that all [of] the allegations in the complaint are true . . . ." *Twombly*, 550 U.S. at 555.  As emphasized by *Iqbal*, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is "plausible" on its face:

> [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief. *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)) (internal citations omitted).

*Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)) (internal citations omitted).

14

As an alternative measure of recovery, the Defendants have moved for the entry of a summary judgment pursuant to Fed. R. Civ. P. 56(c). Under this Rule, a motion for a summary judgment should be granted only if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." The burden is on the movant to demonstrate the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In assessing a summary judgment motion, the Court is obliged to examine the pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). It is the responsibility of the court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Hence, a summary judgment must be entered only if (1) the evidence clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. 317, 322 (1986). Importantly, the presentation of a mere scintilla of supporting evidence is insufficient. *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

III.

The amended complaint in this action contains four distinct counts, all of which will be

15

evaluated *seriatim*; to wit, (1) patent infringement in violation of 35 U.S.C. § 271, (2) breach of the Separation Agreement, (3) misappropriation of trade secrets, and (4) unfair competition in violation of Michigan common law.

As a threshold matter, the Court declines the invitation by the Defendants to dismiss the Plaintiffs' claims on grounds that it lacks subject matter jurisdiction. Congress has established that under 28 U.S.C. § 1338(a), the district courts "shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks." Moreover, under the well-pleaded complaint rule, subject matter jurisdiction will be found if the plaintiff's well-pleaded complaint shows that a federal question exists. *See generally, Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."); *Litecubes, LLC v. Northern Light Products, Inc*., 523 F.3d 1353, 1360 (Fed. Cir. 2008) ("subject matter jurisdiction exists if a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.") (internal quotations omitted). Here, Federal-Mogul has alleged a violation of 35 U.S.C. § 271, a provision of the Patent Act which undoubtedly creates a federal cause of action over patent cases pursuant to 28 U.S.C. § 1338(a). The Plaintiffs, in their amended complaint, specifically averred that Mahle had been infringing, while actively inducing others to infringe, and/or contributing to the infringement of its patents through "[d]eveloping, manufacturing, and offering for sale its MonoWeld® piston products." (Amended Compl. ¶ 84). In light of these allegations within the amended complaint, the Court is satisfied that it has subject matter to consider the merits

16

of Federal-Mogul's lawsuit. Contrary to the Defendants' representations, it is well-settled that a plaintiff's potential inability to prevail on the merits does not strip a court of authority to preside over a case. *Litecubes, supra* ("[J]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.") (modifications in original); *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'"). Inasmuch as the challenge that Mahle raises (namely, whether its allegedly infringing acts occurred in the United States) simply implicates an element of the Plaintiffs' claim for patent infringement, its request for a dismissal for lack of subject matter jurisdiction must be denied. *Litecubes, supra* at 1366.

## A.

Federal-Mogul also claims that Mahle has infringed the '472 and '457 patents in violation of 35 U.S.C. § 271 which provides, in relevant part, that: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." The Court of Appeals for the Federal Circuit has acknowledged that the making, using, or selling of a patented invention involves so-called "direct infringement." *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 -774 (Fed. Cir. 1993).

In order to prevail on this theory, Federal-Mogul must show that Mahle performs each and every step or element of its claimed methods as articulated in the '472 and '457 Patent. *BMC*

*Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007). Alternatively, the Plaintiffs can satisfy their burden by showing that Mahle controls or directs the actions of another entity. *Centillion Data Systems, LLC v. Qwest Communications Intern., Inc.,* 631 F.3d 1279, 1284 (Fed. Cir. 2011). However, unless Federal-Mogul can demonstrate that Mahle exercised control or direction over the entire process to such an extent "that every step is attributable to the controlling party," no infringement liability can be found to exist. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008).

A defendant cannot avoid liability for infringement by merely having another entity carry out claimed steps on its behalf. *BMC Resources* at 1379. In *Akmai Technologies, Inc. v. Limelight Networks, Inc.,* 629 F.3d 1311, 1318-1320 (Fed. Cir. 2010), the Federal Circuit decided that a finding of joint infringement could be made only upon showing the existence of an agency relationship between the parties who performed the methods (or when one party is contractually obligated to do so). However, it should be noted that *Akamai* was recently vacated by the Federal Circuit to allow for a rehearing en banc, thus creating uncertainty in this particular aspect of patent infringement law. *Akamai Technologies, Inc. v. MIT*, Nos. 2009-1372, 2009-1380, 2009-1416, 2009-1417, 2011 WL 1518909 (Fed. Cir. Apr. 20, 2011).

In furtherance of their arguments, Mahle argues that Federal-Mogul's own proofs establish that Mahle was not the entity who was responsible for performing its allegedly patented methods. In support of this position, Mahle points to the declarations of Westbrooke, Schneider, and Ribeiro, all of whom have attested in one form or another that based on their conversations with M Tech engineers, it was clear to each of them that M Tech was making steel friction-welded pistons for Mahle. However, Mahle argues that because M Tech was never under its "dominion and control,"

18

it cannot be said to have performed each and every required step of the methods contained in the '472 Patent, making this count subject to dismissal under Fed. R. Civ. P. 12(b)(6).

In response, Federal-Mogul emphasizes that Westbrook, Schneider, and Ribeiro made it clear that M Tech was undertaking the friction-welding step, but that it was doing so at the behest of Mahle. It also makes reference to the deposition testimony of Spindler that M Tech did not form or design the piston, but provided a friction-welding service to the Defendants upon its request and based on their orders. In light of this evidence, Federal-Mogul claims that it has established a genuine issue of a material fact on the question of Mahle's exercise of control or direction over the entire claimed method.

Based on its review of the record, the Court finds that a grant of summary judgment on Federal-Mogul's claim for infringement of the '472 Patent would be - at best - premature. The Court believes that based on the above-described evidence regarding GM's communications with Mahle confirming that it intended to award its DMAX business to Mahle's location in Morristown, Tennesse (and internal emails from Mahle in Morristown affirming GM's view of same), a jury could reasonably find that the Defendants were offering to sale products that allegedly infringed the claim 5 methods of the '472 Patent. This finding is buttressed by the existence of exemplar quotes, purchase orders, invoices, and drawings submitted by Federal-Mogul, all of which raise a reasonable inference that Mahle was, through its contracting process, directing M Tech as to how, when, and in what quantities it was to produce the allegedly infringing pistons. This, the Court believes, is sufficient to prevent the entry of a summary judgment on the question of whether Mahle exercised direction and control over the entire process such that it could be liable for direct infringement. As to this count, at least as it relates to the '472 claims, the Defendants' motion is therefore denied.

19

Notwithstanding the finding by the Court regarding the '472 Patent, the request to dismiss and/or for the entry of a summary judgment regarding the '457 Patent is warranted. Even assuming - without deciding - that the claims by Federal - Mogul as to this Patent can withstand a Rule 12(b)(6) analysis, there is a paucity of evidence in the record to substantiate its argument that the '457 Patent has been infringed by Mahle. In its attempt to save this aspect of its lawsuit, Federal-Mogul attempts to narrow the breadth of the claims in the '457 Patent by focusing on what is, undeniably, one limited aspect; namely, the manganese phosphate coating. While Federal - Mogul correctly notes that this is an important aspect of the '457 Patent, it virtually ignores the other specific portions of this Patent's claims. As noted above, to resist a summary judgment and ultimately prevail on this issue, Federal-Mogul must present evidence that Mahle or the affiliates under its direction or control performed each and every step or element of its claimed methods as articulated in the '457 Patent. *BMC Resources, Inc. v. Paymentech, L.P.*, *supra* at 1373. Nevertheless, unlike the case with the '472 Patent, Federal-Mogul has not pointed to a specific allegedly infringing product with any indication as to how its exclusive rights in the '457 Patent's claimed methods have been violated. Because Federal-Mogul has failed to establish the existence of a genuine issue of a material fact on this cause of action, Mahle's request for the entry of a summary judgment on this count will be granted.

### B.

Next, in a relatively brief argument, Mahle asks the Court to dismiss Federal-Mogul's breach of contract claim arising out of the 1996 Separation Agreement. To plead a claim for breach of contract under Michigan law, a plaintiff must first establish the elements of a valid contract. *In re Brown,* 342 F.3d 620, 628 (6th Cir. 2003) (citing *Pawlak v. Redox Corp.*, 182 Mich. App. 758

20

(1990)).  Those elements include (1) the identities of the parties who are competent to execute an enforceable contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation.  *Id.*  Once a plaintiff has proven the existence of a valid contract, it - as the aggrieved party - has the obligation to prove by a preponderance of the evidence (1) the terms of the contract, (2) a violation of those terms by the defendant, and (3) the claimed harm.  *Id.*

Moreover, as the Defendants properly note, Michigan law places a six-year limitations period on an aggrieved party's ability to bring a cause of action for breach of a general contract.  Mich. Comp. Laws § 600.5807(8).[7]  Here, Federal-Mogul does not dispute that the Separation Agreement expired on March 19, 1997 upon the divestiture of Mahle of its interests in Metal Leve America.  However, it does claim that rather than expiring six years later in March of 2004, the six year limitations period was tolled because of fraudulent concealment by Mahle.  Mich. Comp. Laws. § 600.5855.

According to the allegations in the amended complaint, Federal-Mogul accuses Mahle of (1) possessing Metal Leve America's confidential trade secrets, (2) knowingly and fraudulently concealing that it possessed this information during the divestiture period, and (3) affirmatively

---

[7]The statute provides, in pertinent part:

No person may bring or maintain any action to recover damages or sums due for breach of contract, or to enforce the specific performance of any contract unless, after the claim first accrued to himself or to someone through whom he claims, he commences the action within the periods of time prescribed by this section.

. . .

(8) The period of limitations is 6 years for all other actions to recover damages or sums due for breach of contract.

Mich. Comp. Laws § 600.5807(8).

representing to the FTC and Metal Leve America that it was holding the latter's business separate from its own.

In order to prevail under this theory under Michigan law, a plaintiff must plead and prove the existence of a false or misleading representation that was made under circumstances where there was a legal or equitable duty to disclose. *U.S. Fidelity and Guaranty Co. v. Black*, 412 Mich. 99, 124 (1981). When pleading fraud, there must be allegations that (1) the defendant made a material representation; (2) it was false; (3) when the representation was made, the defendant knew that it was false, or made it recklessly without any knowledge of its truth, and as a positive assertion; (4) the defendant made the representation with the intention that it should be acted upon by the plaintiff; (5) the plaintiff acted in reliance upon it; and (6) a harm was suffered by the plaintiff as a result thereof. *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (1976). Each of these facts must be proven with a reasonable degree of certainty, and all of them must be found to exist. Moreover, mere silence is not enough. That is, the plaintiff must prove that the defendant committed affirmative acts or misrepresentations that were designed to prevent subsequent discovery. *Sills v. Oakland General Hosp.,* 220 Mich. App. 303, 310 (1996).

Under the circumstances of this case, the Court believes that Federal-Mogul's claim for statutory tolling cannot withstand Rule 12(b)(6) standards. The complaint lacks sufficient allegations that Mahle made specific affirmative representations with the intent that Federal-Mogul would rely upon them to their detriment. One could speculate that if Federal-Mogul is correct, Mahle made its affirmative misrepresentations with the intent of assuring T&N, the FTC and others that it was complying with the law, and to avoid further scrutiny into its devious motives. One could also infer that, based on the Company's representations, no further inquiries into its compliance were

22

conducted because of its promises of compliance. Nevertheless, in the post-*Iqbal* and *Twombly* world of pleading standards, mere supposition about the inferences to be drawn from a complaint cannot carry the day. Inasmuch as the Plaintiffs' pleading is deficient as to elements four and five of the *Hi-Way Motor Co.* test, *supra*, the Defendants' request for the Court to dismiss the breach of contract claim must be, and is, granted.

C.

To plead a cause of action for violations of the Michigan Uniform Trade Secrets Act ("MUTSA"), Federal-Mogul must allege that (1) it has protectable trade secrets, and (2) Mahle has improperly acquired, disclosed or used those trade secrets. *See Compuware Corp. v. International Business Machines Corp.*, No. 02-70906, 2003 WL 23212863, *6 (E.D. Mich. Dec. 19, 2003); Mich. Comp. Laws § 445.1902. A court can enjoin the actual or threatened misappropriation of a trade secret and can also compel affirmative acts necessary to protect a trade secret. *CAI Intern., Inc. v. Interest Intern. Corp.,* 251 Mich. App. 125, 132 (2002). According to the law in Michigan, the word, "misappropriation" includes the disclosure or use of a trade secret without consent. Mich. Comp. Laws. § 445.1902(b)(ii).

Moreover, under MUTSA, in order to qualify as a trade secret, the information must separately (1) "derive[ ] independent economic value . . . from not being generally known" and (2) be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Compuware Corp.* at *6. Information may be "generally known" if it has been disclosed to, is known to, or is ascertainable by persons in the relevant industry or field. *Id.* Finally, a party alleging trade secret misappropriation must particularize and identify the purportedly misappropriated trade secrets with specificity. *Id.*

23

A review of the complaint by the Court reveals that the Plaintiffs have adequately advanced a purported violation of the MUTSA.  As to the first element (i.e., the presence of protectable secrets) in paragraph 108 of the complaint, the Plaintiffs accuse Mahle of acquiring knowledge and possession of Metal Leve's confidential information as a result of the acquisition, including but not limited to its engineering drawings and designs, specifications, friction-weld process documentation, and the like.  The Court is persuaded that these allegations are sufficient to identify the sort of information from which the parties could derive an independent economic value by retaining confidential information.  *Compuware, supra*.  Moreover, the parties went to great lengths to keep this information confidential pursuant to the Separation Agreement, giving further credence to (1) a view that it was of a sensitive nature, and (2) the Defendants should have known not to disclose it.  As to the second prong, there are at least minimal allegations that Mahle has used Metal Leve's trade secrets to develop friction-welded steel pistons without any express or implied consent.  In light of these alleged facts, the request by the Defendants to dismiss this aspect of the Plaintiffs' complaint must be denied.

### D.

Finally, Federal-Mogul has raised a claim for common law unfair competition.  Michigan's common law of unfair competition prohibits unfair and unethical trade practices that are harmful to a competitor or to the general public. *See, e.g., Clairol, Inc. v. Boston Discount Center of Berkley, Inc.*, 608 F.2d 1114, 1118 (6th Cir. 1979).   Each unfair competition case "is determined upon its own facts and relief is based upon the principles of common business integrity." *Good Housekeeping Shop v. Smitter*, 254 Mich. 592, 596 (1931) (citation omitted) The term "unfair competition" may encompass any conduct that is fraudulent or deceptive and tends to mislead the public. *See*

*generally, Atco Industries, Inc. v. Sentek Corp.*, No. 232055, 235398, 2003 WL 21582962 (Mich. App. Jul. 10, 2003).

Here, Mahle seeks a dismissal of this claim, contending that it is a tort action which must rest upon a breach of a duty which is distinct from a contractual obligation. The Court is inclined to agree. As other courts in this district have noted, Michigan law provides that "where a contract exists, a tort claim may only be maintained on the basis of a legal duty that is separate and distinct from the contractual obligation." *Consolidated Rail Corp. v. Grand Trunk Western Railroad Co.*, No. 10179, 2009 WL 3460334, *6 (E.D.Mich. Oct.22, 2009), quoting *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.,* 454 Mich. 65 (1997). Although the Plaintiffs correctly note that the cases cited by the Defendants in some instances sound in insurance, it does not explain why this standard should apply with any less force in unfair competition cases. Inasmuch as the Court is not persuaded that the Plaintiffs have overcome the foregoing legal principles, the Defendants' request for the entry of a summary judgment will be granted.

## IV.

Finally, the Court turns to Federal-Mogul's request for immediate injunctive relief. Rule 65(a) of the Federal Rules of Civil Procedure permits a court, in its discretion, to issue a preliminary injunction against an adverse party. The purpose of such an injunction is to preserve the relative positions of the parties until a trial on the merits can be held. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The moving party bears the burden of establishing the need for a preliminary injunction. *See generally, Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 442-43 (1974).

In determining the propriety of injunctive relief, a court should consider if (1) the movant

has shown that it is likely to succeed on the merits; (2) the movant is likely to suffer an irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) the requested injunction will have a positive or a negative impact on the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "In making its determination, the district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue." *Lorillard Tobbacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 380 (6th Cir. 2006).

### A.

To prove a likelihood of success on the merits in a patent infringement suit, the party seeking injunctive relief must show that it will (1) likely prove infringement and (2) likely withstand challenges, if any, to the validity of the patent. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). If the party opposing the injunction raises a "substantial question" concerning validity, enforceability, or infringement - such as asserting a defense that the plaintiff cannot show lacks substantial merit - no preliminary injunction should issue. *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

The Court notes at the outset that Federal-Mogul, as the holder of the '472 and '457 patent, enjoys a presumption that its patents are valid. If this issue were being resolved by a fact-finder at a trial, the burden would be on Mahle to rebut the presumption by presenting clear and convincing evidence of invalidity. *Pennwalt Corp. v. Akzona, Inc.*, 740 F.2d 1573, 1578-1579 (Fed. Cir. 1984). However, at the preliminary injunction stage, the Court does not need to resolve the validity question, but rather attempts to assess the persuasiveness, if any, of Mahle's evidence of invalidity. *Titan Tire, supra* at 1377. The burden remains on Federal-Mogul as the movant to convince the

26

Court that it is likely to succeed at a trial on the merits notwithstanding a validity challenge.  *Id.*

Federal-Mogul can satisfy this burden by showing that the alleged defense "lacks substantial merit."

*Id.*  Ultimately, the task of the Court is to weigh the evidence that is available to it at the preliminary

stage in the proceedings, and to determine whether there is a "substantial question" concerning the

validity of the patent (i.e. "[whether] the alleged infringer has presented an invalidity defense that

the patentee has not shown lacks substantial merit").[8]  *Id.*  If so, the patentee has not succeeded in

showing it is likely to succeed at trial on the merits of the validity issue.  *Id.*

Originally, Federal-Mogul had sought to obtain the entry of a preliminary injunction solely

as to its infringement claims related the '472 Patent. However, in the latest version of the pleadings

that have been filed with the Court, the Plaintiffs also appear to seek injunctive relief as to claims

related to the '457 patent.

As noted above, if the evidence is accepted by a jury, the Court believes that initially,

Federal-Mogul is likely to prevail on the merits of its infringement claim as it relates to the '472

Patent.   The declaration from Keri Westbrooke, with its accompanying claim chart which

deconstructs the Mahle Monoweld® piston, provides some evidence tending to suggest that the

product infringes every step of claim 5 of the '472 patent.  Moreover, the hearing testimony of

Montgomery Wilder of Mahle Engine Components U.S.A. in Morristown, Tennessee indicated that

on a test basis, Mahle has worked with M Tech to make and use friction-welded steel pistons in the

United States for engines for several companies, including Daimler, Volvo, Caterpillar, Cummings,

and GM.  (Transcript at 117-122).  When coupled with the documentary evidence of invoices,

---

[8]The *Titan Tire* court further expounded that "the trial court, after considering all the
evidence available . . . must determine whether it is more likely than not that the challenger will
be able to prove at trial, by clear and convincing evidence, that the patent is invalid.").  566 F.3d
at 1372.

purchase orders, engineering drawings, and Westbrook's claim chart construction of the pistons for the various engines, the evidence in the record presents a fairly arguable case of patent infringement.

The Court thus turns its attention to whether Federal-Mogul is likely to withstand Mahle's assorted challenges to the validity, enforceability, and/or infringement of the '472 Patent. Mahle first argues that Federal-Mogul cannot prove infringing conduct, inasmuch as the accused piston bears a "top-weld" design, which is allegedly different from the design identified in claim 5 of the '472 patent. To support its attempt to distinguish between the two designs, Mahle relies on a construction of the patent language, as well as testimony from Wilder that the flashing on the top-weld design being used for the GM program is located in a different space, namely, in the combustion bowl, as opposed to being located in the pin boss area, as indicated in the '472 Patent. However, in response to this evidence, Federal-Mogul points to testimony from (1) Mahle's own witness, Dietmar Gabriel, that nothing in claim 5 of the '472 Patent requires the friction weld to be below a certain combustion chamber, and (2) an affidavit from Westbrook which essentially establishes that Wilder's testimony and Mahle's interpretation do not raise a relevant distinction between the GM top-weld pistons and pistons created according to the '472 patent design. Upon reviewing this competing evidence, the Court concludes that Federal-Mogul has not accurately characterized Gabriel's testimony. More importantly, however, the Court does not believe that based on Wilder's brief testimony, it is "more likely than not" that Mahle will be able to prove by clear and convincing evidence at trial that the top-weld design is sufficiently distinct from the '472 design to avoid infringement liability. Accordingly, as to this argument, Mahle's claimed defense of non-infringement does not defeat the likelihood that Federal-Mogul can prevail in its lawsuit over the '472 patent.

Mahle's next argument is more formidable, however. According to the Company, it cannot

be liable for infringing the '472 patent because M Tech performs the claimed friction welding steps that were allegedly patented by Federal-Mogul. And as noted above, there is evidence from M Tech representatives and from Federal-Mogul's employees that it is this company, not Mahle, that performs the patented steps. The parties acknowledge that the state of the law in the Federal Circuit is in flux as to this question, given the *en banc* rehearing that is pending in *Akamai, supra.* It is true that under current principles, Mahle cannot escape liability simply by outsourcing the infringing steps, *BMC Resources, supra*, but Federal-Mogul still needs to show that Mahle controls or directs the actions of M Tech in friction welding its pistons. And given the first opinion, now vacated, in *Akamai*, its burden may even turn out to be heavier, requiring a showing of an agency relationship. In the judgement of the Court, the evidence in the record to date, if believed by a jury, could allow Mahle to establish by clear and convincing evidence at trial that it cannot be held liable for infringement of the '472 patent because of its lack of dominion and control over every step of the patented method (and/or because it does not maintain a relationship with M Tech wherein Mahle acts as the Company's principal). Inasmuch as Federal-Mogul cannot and has not shown that this particular defense is without substantial merit, it cannot establish a likelihood of success of the merits in its claim for infringement of the '472 patent.[9] This factor thus weighs in favor of Mahle as to the '472 patent.

As to Federal-Mogul's claims for infringement of the '457 patent, it relies upon (1) a declaration from Westbrook, and (2) what appears to be an accusation that Mahle infringed the patent by using manganese phosphate on certain surfaces of the pistons. Yet, in the judgement of

---

[9]In light of this finding, the Court will not address Mahle's remaining arguments regarding the invalidity of the patent based on prior art and alleged inequitable conduct by Federal-Mogul.

29

the Court, this evidence is insufficient to show that Federal-Mogul is likely to succeed on the merits of this particular infringement claim. The parties have devoted scant attention to the remaining elements of the '457 patent, particularly to the question of whether – aside from the manganese phosphate – the accused pistons allegedly being offered to GM and Caterpillar incorporate "each and every claim element or its equivalent" of the contested claims of the '457 patent. This is one of the most basic showings that must be made to establish a case of patent infringement. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011). Inasmuch as this undercuts Federal-Mogul's claim of achieving a strong likelihood of success on the merits as to the infringement of the '457 Patent, the Court must reject the movant's request for injunctive relief as to this invention.

B.

Federal-Mogul claims that without the intervention of the Court, it will suffer an irreparable harm stemming from a lost market position. In advancing this assertion, it expresses a concern that Mahle, through its allegedly infringing activities, (1) poses a threat to its share of the market, and (2) forces it to face the prospect of losing substantially all of its business with GM on the '472 Patent pistons. In response, Mahle properly notes that a finding of irreparable harm is the single most important factor in a preliminary injunction analysis, and that an order of restraint should not be issued if the alleged harm can be remedied through compensatory relief. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 578 (6th Cir. 2002).

While the loss of market share and the potential for tarnishing of a company's brand are perhaps measurable harms, there has been no showing by Federal-Mogul that time is of the essence here. Its only argument on this point is that (1) GM is making plans now for engines to be built in

30

the 2015 (now 2017) model year, and (2) if no judicial restraint is issued, it will lose its ability to compete with Mahle and others.  This argument is somewhat unpersuasive inasmuch as Federal-Mogul did not seek the entry of a temporary restraining order at an earlier time.  Furthermore, and - in light of GM's decision to push the Duramax program back to 2017- it has presented no convincing evidence which would suggest that the window will close on its business opportunities if the Court declines to intervene on its behalf immediately.

As of now, this factor must be resolved against the issuance of a preliminary injunction. The potential for harm to Federal-Mogul is certainly perceptible, but the Court has not been persuaded by sufficient evidence that the claimed damage is, as Federal-Mogul says, "titanic and possibly catastrophic" to the company.  Such expansive assertions must be supported by the record in order to warrant the extraordinary relief of a preliminary injunction.

## C.

The parties have not identified any harm that would flow to others in a way that is independent of the harm that could attach to the public interest.  This factor thus favors neither party.

## D.

From the standpoint of depressing competition, and/or negatively impacting the local economy, there is a potential for harm to flow from a decision to grant Federal-Mogul's request for a preliminary injunction.  Presumably, the pendency of the litigation could cause GM to lose the opportunity to move forward with its plans for the 2015/2017 diesel engine system if two of its major suppliers are unable to provide the needed service due to delays caused by litigation.

With that having been said, however, there is also a risk of undermining the policy goals

31

that drive the American system of patents; namely, the promotion of fair competition in a free market.  Both of these factors are substantial, and somewhat difficult to quantify.   This factor, accordingly, does not favor either party at this time.

### E.

In summary, the Court must reject the request for a preliminary injunction here where (1) Federal-Mogul has not shown a likelihood of success on the merits of its patent infringement claims for the '472 and '457 patents, and (2) an insufficient amount of evidence has been  shown that it will be irreparably harmed in the absence of a swift and sweeping intervention by the Court. Inasmuch as the Court is not convinced that the case should be removed from the normal process as outlined in the Federal Rules of Civil Procedure and elsewhere for processing patent cases, the request by Federal-Mogul for injunctive relief must be, and is denied.

### V.

Therefore, for the reasons that have been stated above, (1) the motions to dismiss by Mahle are granted in part and denied in part, and (2) Federal-Mogul's request for a preliminary injunction is denied.

The motion for permission for leave to file a response to Mahle's sur-reply is granted, but the motions to strike filed by both parties are denied.

IT IS SO ORDERED.


Dated: September 27, 2011                    S/Julian Abele Cook, Jr.
          Detroit, Michigan                            JULIAN ABELE COOK, JR.
                                                             United States District Court Judge

32

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 27, 2011

s/ Kay Doaks
Case Manager